## CLAYCOMB v YOUNGSTOWN (city)

Ohio Appeals, 7th Dist, Mahoning Co

No 2484. Decided Oct 21, 1938

Levin & Lewis, Youngstown, for plaintiff-appellant.

H. H. Hunt, Youngstown, for defendant-appellee.

## OPINION

By CARTER, J.

This cause is in this court on appeal on questions of law. The action below was one for wrongful death, prosecuted in the name of appellant as administrator of the estate of Glen Claycomb, Jr., deceased, it being claimed by appellant that decedent's death, he being a child a little over three years of age, was brought about and proximately due to the maintenance by appellee of a nuisance in one of its public parks known as Pine Hollow Park.

The City of Youngstown maintains within its corporate limits this public park, and in connection and as a part of the facilities thereof maintains a well to supply drinking water to persons visiting the park, the well being equipped with a pump, and it is claimed that the water in the well became contaminated and was, by reason thereof, unfit for human consumption; that appellant's decedent drank therefrom, became ill and died of acute gastroenteritis, which appellant alleges resulted directly and proximately from the drinking of water from this well.

Appellee, in its answer, admits being the owner of the land included in what is known as Pine Hollow Park; that the park is located within the limits of the City of Youngstown, and that the park is operated by and under the supervision of the city as a public park; that there is a well within the park for the purpose of supplying drinking water, and that on or about the 18th day of July, 1934, the city chemist, as a precaution, advised the closing of the well. Then follows a general denial of all the other allegations and averments not admitted.

There seems to be no contest in regard to the fact that on July 18, 1934, a report of the chemist was made concerning the condition of the water in the well; that on July 21, 1934, appellant's decedent drank water drawn from this well, and that he became ill on July 22nd, and that he died on July 25, 1934, of acute gastroenteritis.

The cause came on for trial to the court and jury, and at the close of all the evidence, on motion of defendant, the court directed a verdict in its favor on the ground that plaintiff had failed in proving causation; that is, that the cause of decedent's death was not traceable to or brought about by the drinking of the water.

The city chemist testified that the water as tested on or about July 5th and 9th, 1934, did not conform to the standards of safe drinking water, and this report was conveyed to the park commissioner, Lionel Evans. He testifies further, "My report was that it was suspicious", referring to the water. He further says he did not think there was anything harmful in the water. Mrs. Freer testified she drank this water on the 21st of July and she became sick the morning following, vomiting and running of the bowels. The boy became sick shortly thereafter and a red spot appeared about the size of a half dollar, on the boy's breast. There is also testimony in the record that deceased and some of the other members of the family ate candy and apples and that his illness came on about a day later.

R. C. McBride, a chemist, whose chief work is the testing of drinking water, testified that if bacilli coli is found in drinking water, such water is not recognized as safe drinking water, and there is testimony in the record that the water contained bacilli coli. The following questions were propounded to Mr. McBride, on page 130 of the record:

"Q. Now, Mr. McBride, assume that on July 5, 1934, the city chemist of Youngstown took a sample of water from the well at Pine Hollow Park, and assume that an analysis was made, and this is the report of the analysis: Bacteria per CC, 37 degrees centigrade, 20; bacteria per CC, 20 degrees centigrade, 10; bacillus coli in 1 CC, present; bacillus coli in ten CC, present. Have you an opinion as to whether or not this water was fit for human consumption?

A. I have.

Q. What is that opinion?

A. It is a dangerous water to drink."

Then on page 131 the following questions were propounded:

"Q. Assume, doctor,—Mr. McBride, that on the 9th day of July, 1934, water was drawn from the well at Pine Hollow Park, that the city chemist made a test, analyzing the water, and reported the same as follows: Bacteria per CC, 37 degrees centigrade, 10; bacteria per CC, 20 degrees centigrade, 15; bacillus coli in one CC, present; bacillus coli in ten CC, present. Have you an opinion as to whether or not that water, so analyzed, was fit for human consumption?

A. I have.

Q. What is your opinion?

A. It was not."

And there is evidence in the record upon which this hypothetical question was properly based. However, he did admit on cross examination that coli bacillus other than disease producing germs would not make the water harmful for human consumption, and no claim is made that the deceased died of a disease.

Dr. Ranz, a physician and surgeon was called on behalf of plaintiff and testified, using as a basis the hypothetical question hereinbefore recited, his answer being that the drinking of this water would, with reasonable certainty, have produced the death of deceased. He also testified that the probabilities were that if the boy ate green apples and drank this water, that the two combined had something to do with his condition, the green apples acting as an irritant, and that others might be immune from the bad effect of the water, and the child, being of tender years, might not be so immune as adult persons. He also testified that if the diagnosis was correct and showed that the death of the child was due to food poisoning then the water could not have had anything to do with the death. In this connection we might suggest that it is urged that many other children and adults drank this water without any ill effects. Dr. Ranz testified that some people might be immune and others not immune, and that this being a young child, the child might not have been immune. due to his tender years, while others might be able to throw off any evil effects of the water in question if it did contain dangerous germs. The mother also testified that the child ate some chocolate candy on Saturday, but ate no apples.

The defendant called as a witness Dr. Walter J. Tims, who performed a post mortem on July 24, 1934. His official report is attached to the bill of exceptions. This record indicates that the child appeared to be quite normal but stated upon opening the intestines they were infected throughout. He testified that he was health commissioner in the City of Struthers; that he signed the death certificate known as plaintiff's Exhibit 1; that he was called as a physician to attend the child and that he found the child acutely ill with what appeared to be gastro-intestinal disturbance, that is; gastro-intestinal toxemia. The death certificate indicates that the principal cause of death and related causes of importance in order of onset were as follows: Gastroenteritis acute, date of onset July 21; that he attended the deceased from July 21, 1934, to July

25, 1934. He further testified that it was his belief that his death was due from what we call commonly a food poisoning or a food toxemia.

"Q. When you say food poisoning, does that include claimed water pollution?
A. There would be a possibility there; I think it would be only a possibility. I don't believe you could exclude such a possibility; at least I could not to my own satisfaction.
Q. In your opnion, this came from water or food?
A. It came, in my opinion, from a food poisoning. That is my opinion."

The defendant then called Dr. Gabriel S. Kramer, a practicing physician, who is also a pathologist. The hypothetical question hereinbefore recited in this opinion was also propounded to him. He testified that under the statements in the hypothetical question that the water would be fit to drink. He also testified that he examined the report of the post mortem and from what he had been told here and asked here the illness was not due to water.

A reading of the record convinces the court that reasonable minds might arrive at different conclusions as to the cause of this child's death. That being the case, a factual question was presented for determination by the jury. It is our view that the court erred in instructing the jury to return a verdict in favor of the defendant. For this reason the lower court is reversed and the cause remanded to that court for further proceedings in accordance with law.

NICHOLS, PJ, and BENNETT, J, concur in the judgment.

## CONCURRING OPINION

By BENNETT, J.

This case is one illustrating the difference between applying a test of "manifest weight of the evidence" and evidence as to which "reasonable minds could not differ." I believe that a finding in favor of the plaintiff would have been manifestly against the weight of the evidence, but cannot say that reasonable minds could not have differed about it. In the one test I am applying my own opinion as to the weight of the evidence, and in the other I am giving my opinion as to whether it is so clear that others might not differ about it. Dr. Ranz's testimony is really the only testimony in the record by which the plaintiff

attempted to show the probability that the water was the cause of death. On direct examination he refused to talk in terms of "probability" and concluded by saying that "probable" and "possible" meant virtually the same thing. His first answer to the hypothetical question was "yes, it may", (R. p. 150) and continued (R. p. 151) "Yes. That those are possible." "Or, it may be possible; yes, it is possible." "Yes, it could be probable." And then went on to say that the two words, probable and possible, meant virtually the same thing. (R. p. 152).